AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information associated with Facebook IDs 100080329325309,<br>100056904720046, and 100084368808895 stored at premises<br>controlled by Meta Platforms, Inc. | )<br>)<br>)<br>)<br>)<br>)    Case No. 23-ml-1937 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| See Attached Affidavit in<br>Support of Search Warrant | |

The application is based on these facts:

See Attached Affidavit in Support of Search Warrant

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Todd C. Bina
_____
*Applicant's signature*

Todd C. Bina, SSA, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: _____

_____
*Judge's signature*

City and state:  Washington, D.C.

Robert B. Collings, U.S. Magistrate Judge
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means  ❑ Original   ❑ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Information associated with Facebook IDs<br>100080329325309, 100056904720046, and<br>100084368808895 stored at premises controlled by Meta<br>Platforms, Inc. | )<br>)<br>)   Case No.  23-ml-1937<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, hereby incorporated by reference

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, hereby incorporated by reference

**YOU ARE COMMANDED** to execute this warrant on or before _____October 27, 2023_____ *(not to exceed 14 days)*
❑ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Robert B. Collings, U.S. Magistrate Judge_____.
*(United States Magistrate Judge)*

❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❑ for _____ days *(not to exceed 30)*   ❑ until, the facts justifying, the later specific date of _____.

Date and time issued: _____      _____
*Judge's signature*

City and state:  Washington, D.C._____      Robert B. Collings, U.S. Magistrate Judge
*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

**Return**

| Case No.:<br>23-ml-1937 | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**<u>ATTACHMENT A</u>**
**Property to Be Searched**

This warrant applies to information that is associated with the Facebook accounts identified by account **IDs 100080329325309**, **100056904720046**, and **100084368808895**, and are stored at premises owned, maintained, controlled, or operated by Meta Platforms Inc., a company that accepts service of legal process at 1601 Willow Road, Menlo Park, California.

**ATTACHMENT B**

**Particular Things to be Seized and Procedures
to Facilitate Execution of the Warrant**

I.      **Information to be disclosed by Meta Platforms Inc. ("PROVIDER") to facilitate
        execution of the warrant**

      To the extent that the information described in Attachment A is within the possession,

custody, or control of PROVIDER, regardless of whether such information is located within or

outside of the United States, including any messages, records, files, logs, or other information

that have been deleted but are still available to PROVIDER, or have been preserved pursuant to a

request made under 18 U.S.C. § 2703(f), PROVIDER is required to disclose the following

information to the government for the accounts or identifiers listed in Attachment A (collectively

the "Accounts"):

      a.   For **Facebook ID 100080329325309** for the time period from **April 7, 2022, to and

           including November 30, 2022**: The contents of any available messages or other

           communication associated with the Account (including, but not limited to messages,

           attachments, draft messages, posts, chats, video calling history, "friend" requests,

           discussions, recordings, images, or communications of any kind sent to and from the

           Account, including stored or preserved copies thereof), and related transactional

           records for all PROVIDER services used by an Account user, including the source

           and destination addresses and all Internet Protocol ("IP") addresses associated with

           each communication, the date and time at which each message or other

           communication was sent, and the size and length of each message or other

           communication;

2

b. For **Facebook ID 100056904720046** for the time period from **September 1, 2021, to and including November 30, 2022**: The contents of any available messages or other communication associated with the Account (including, but not limited to messages, attachments, draft messages, posts, chats, video calling history, "friend" requests, discussions, recordings, images, or communications of any kind sent to and from the Account, including stored or preserved copies thereof), and related transactional records for all PROVIDER services used by an Account user, including the source and destination addresses and all Internet Protocol ("IP") addresses associated with each communication, the date and time at which each message or other communication was sent, and the size and length of each message or other communication;

c. For **Facebook ID 100084368808895** for the time period from **August 14, 2022, to and including November 30, 2022**: The contents of any available messages or other communication associated with the Account (including, but not limited to messages, attachments, draft messages, posts, chats, video calling history, "friend" requests, discussions, recordings, images, or communications of any kind sent to and from the Account, including stored or preserved copies thereof), and related transactional records for all PROVIDER services used by an Account user, including the source and destination addresses and all Internet Protocol ("IP") addresses associated with each communication, the date and time at which each message or other communication was sent, and the size and length of each message or other communication;

3

d. For **Facebook ID 100080329325309** for the time period from **April 7, 2022, to and including November 30, 2022**: All photographs and videos uploaded by the Account, including Exchangeable Image File ("EXIF") data and any other PROVIDER data associated with those photographs and videos;

e. For **Facebook ID 100056904720046** for the time period from **September 1, 2021, to and including November 30, 2022**: All photographs and videos uploaded by the Account, including Exchangeable Image File ("EXIF") data and any other PROVIDER data associated with those photographs and videos;

f. For **Facebook ID 100084368808895** for the time period from **August 14, 2022, to and including November 30, 2022**: All photographs and videos uploaded by the Account, including Exchangeable Image File ("EXIF") data and any other PROVIDER data associated with those photographs and videos;

g. From the inception of the Accounts to the present: Basic subscriber records and login history, including all records or other information regarding the identification of the Accounts, to include full name, physical address, telephone numbers, birthdate, security questions and responses, and other personal identifying information, records of session times and durations, the date on which the Accounts were created, the length of service, types of services utilized by the Accounts, the IP address used to register the Accounts, login IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number), and any account(s) linked by machine cookies (meaning all

4

Facebook user identification number ("user IDs") that logged into Facebook by the
same machine as the Accounts);

h. For **Facebook ID 100080329325309** for the time period from **April 7, 2022, to and
including November 30, 2022**: All records or other information related to the
Account, including address books, contact and "friend" lists, calendar data, and files;
profile information; "News Feed" information; "Wall" postings; Notes; groups and
networks of which the Account is a member; future and past event postings; rejected
"friend" requests and blocked users; status updates (including relationship status
updates); comments; gifts; "pokes"; "tags"; the account's usage of the "like" feature,
including all Facebook posts and all non-Facebook webpages and content that the
user has "liked"; searches performed by the Account; privacy settings, including
privacy settings for individual Facebook posts and activities; information about the
Account's access and use of Facebook applications; and the Account's access and use
of Facebook Marketplace;

i. For **Facebook ID 100056904720046** for the time period from **September 1, 2021, to
and including November 30, 2022**: All records or other information related to the
Account, including address books, contact and "friend" lists, calendar data, and files;
profile information; "News Feed" information; "Wall" postings; Notes; groups and
networks of which the Account is a member; future and past event postings; rejected
"friend" requests and blocked users; status updates (including relationship status
updates); comments; gifts; "pokes"; "tags"; the account's usage of the "like" feature,
including all Facebook posts and all non-Facebook webpages and content that the
user has "liked"; searches performed by the Account; privacy settings, including

privacy settings for individual Facebook posts and activities; information about the
Account's access and use of Facebook applications; and the Account's access and use
of Facebook Marketplace;

j.   For **Facebook ID 100084368808895** for the time period from **August 14, 2022, to
and including November 30, 2022**: All records or other information related to the
Account, including address books, contact and "friend" lists, calendar data, and files;
profile information; "News Feed" information; "Wall" postings; Notes; groups and
networks of which the Account is a member; future and past event postings; rejected
"friend" requests and blocked users; status updates (including relationship status
updates); comments; gifts; "pokes"; "tags"; the account's usage of the "like" feature,
including all Facebook posts and all non-Facebook webpages and content that the
user has "liked"; searches performed by the Account; privacy settings, including
privacy settings for individual Facebook posts and activities; information about the
Account's access and use of Facebook applications; and the Account's access and use
of Facebook Marketplace;

k.   From the inception of the Accounts to the present: All records pertaining to
communications between PROVIDER and any person regarding the Accounts,
including contacts with support services and records of actions taken;

l.   From the inception of the Accounts to the present: All records or other information
pertaining to devices associated with the Accounts and software used to create and
access the Accounts, including device serial numbers, instrument numbers, model
types/numbers, International Mobile Equipment Identities ("IMEI"), Mobile
Equipment Identifiers ("MEID"), Global Unique Identifiers ("GUID"), Electronic

Serial Numbers ("ESN"), Android Device IDs, phone numbers, Media Access

Control ("MAC") addresses, operating system information, browser information,

mobile network information, information regarding cookies and similar technologies,

and any other unique identifiers that would assist in identifying any such device(s);

and

m. From the inception of the Accounts to the present: Information about any complaint,

alert, or other indication of malware, fraud, or terms of service violation related to the

Accounts or associated user(s), including any memoranda, correspondence,

investigation files, or records of meetings or discussions about the Accounts or

associated user(s) (but not including confidential communications with legal counsel).

Within 14 days of the service of this warrant, PROVIDER shall deliver the information set forth above via United States mail or courier to:  Supervisory Special Agent Miguel Perez, Federal Bureau of Investigation, J. Edgar Hoover Building, MLAT Unit, Room 7848, 935 Pennsylvania Ave., NW, Washington D.C. 20535-0001, or via e-mail to HQ_ISP_MLAT_Returns@FBI.gov.  PROVIDER is specifically authorized to transmit or send the information specified below to the Federal Bureau of Investigation anywhere in the United States, including, but not limited to, Washington, D.C.

7

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of the criminal laws of the Netherlands, specifically, Article 174 of the Penal Code of the Netherlands; Articles 2 and 10 of the Opium Act of the Netherlands; and Article 40 of the Medicines Act of the Netherlands, regarding the unlawful sale of amphetamine, including, for the Accounts, information pertaining to the following matters:

   (a)  Information that constitutes evidence of the identification or location of the user(s) of the Accounts;

   (b)  Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the Accounts about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

   (c)  Information that constitutes evidence indicating the user(s) of the Accounts state of mind, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

   (d)  Information that constitutes evidence concerning how and when the Accounts were accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the user(s) of the Accounts;

   (e)  Information that constitutes evidence concerning the possession, sale, offer for sale, transfer, delivery, and distribution of controlled substances; and

(f)  Information that constitutes evidence of concealing or attempting to conceal

evidence relevant to the investigation.

**III.      Government procedures for warrant execution**

The United States government will conduct a search of the information produced by

PROVIDER and determine which information is within the scope of the information to be seized

specified in Section II.  That information that is within the scope of Section II may be copied and

retained by the United States and shared with appropriate foreign authorities.

Law enforcement personnel will then seal any information from PROVIDER that does

not fall within the scope of Section II and will not further review the information absent an order

of the Court.

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THREE FACEBOOK ACCOUNTS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. PURSUANT TO 18 U.S.C. 2703 AND 3512** | **ML No. <u>23-ml-1937</u>** <br><br> <u>**Filed Under Seal**</u> |

*Reference: DOJ Ref. # CRM-182-88765; Subject Accounts:  Facebook ID 100080329325309, Facebook ID 100056904720046, and Facebook ID 100084368808895*

**AFFIDAVIT IN SUPPORT OF**
<u>**AN APPLICATION FOR A SEARCH WARRANT**</u>

I, Todd C. Bina, being first duly sworn, hereby depose and state as follows:

<u>**INTRODUCTION AND AGENT BACKGROUND**</u>

1.      I make this affidavit in support of an application for a search warrant for information associated with three accounts – that is, **Facebook ID 100080329325309, Facebook ID 100056904720046, and Facebook ID 100084368808895** – which are stored at premises controlled by Meta Platforms, Inc. ("PROVIDER"), an electronic communications services provider and/or remote computing services provider that is headquartered at 1601 Willow Road, Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A), and 3512(a), to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2.      The information requested in this search warrant is being sought pursuant to a request for assistance ("Request") from the Ministry of Justice and Security of the Kingdom of the Netherlands (the "Netherlands"), transmitted to Washington, D.C.  Authorities in the Netherlands are investigating D.W. Mikkers (the "Suspect") for offenses related to the unlawful sale of a controlled substance (*i.e.*, amphetamine), which occurred on or about and between September 1, 2021, to October 13, 2022, in violation of the criminal laws of the Netherlands; specifically, Article 174 of the Penal Code of the Netherlands; Articles 2 and 10 of the Opium Act of the Netherlands; and Article 40 of the Medicines Act of the Netherlands.  A copy of the applicable laws is appended to this application.  This Request is made pursuant to the Agreement comprising the Instrument as contemplated by Article 3(2) of the Agreement on Mutual Legal Assistance Between the United States of America and the European Union signed 25 June 2003, as to the application of the Treaty Between the United States of America and the Kingdom of the Netherlands on Mutual Assistance in Criminal Matters signed at the Hague on 12 June 1981, Neth.-U.S., Sept. 29, 2004, S. TREATY DOC. NO. 109-13 (2006) (hereinafter, the "Agreement").  Under the Agreement, the United States is obligated to render assistance in response to the Request.

3.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since 2005.  I am currently assigned to the International Operations Division, Mutual Legal Assistance Treaty Unit, in Washington, D.C.  My current duties include responding to requests from foreign governments pursuant to mutual legal assistance treaties, including serving as the affiant on search warrant affidavits, serving search warrants, and reviewing the data received in response thereto for relevance in compliance with the parameters of the search warrants.  During my employment with the FBI, I have conducted investigations related to numerous criminal and

counterterrorism investigations.  I have experience in the execution of search warrants and the analysis of collected evidence.  Additionally, I have received training in the operation of computers and the collection and handling of digital evidence.

4.      The facts set forth in this affidavit are based upon information conveyed to the United States via the Request made pursuant to the Agreement by authorities in the Netherlands and upon my training and experience.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of the criminal law of the Netherlands have been committed by the Suspect.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  *See* 18 U.S.C. § 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court "is acting on a request for foreign assistance pursuant to [18 U.S.C.] section 3512 . . . ."  18 U.S.C. § 2711(3)(A)(iii); *see also* 18 U.S.C. § 3512(a)(2)(B) (court may issue "a warrant or order for contents of stored wire or electronic communications or for records related thereto, as provided under section 2703"), § 3512(c)(3) ("application for execution of a request from a foreign authority under this section may be filed . . . in the District of Columbia").

7.     This application to execute the Netherlands's request has been approved and duly authorized by an appropriate official of the Department of Justice, through the Criminal Division, Office of International Affairs ("OIA").[1]  *See* 18 U.S.C. § 3512(a).  An OIA attorney has authorized the undersigned to file this application.

## **PROBABLE CAUSE**

8.     According to authorities in the Netherlands, the Suspect is being investigated by the public prosecutor of Rotterdam, the Netherlands, for the unlawful sale of amphetamine. Dutch authorities allege that the Suspect used three (3) Facebook accounts to advertise and sell weight loss pills that contained amphetamine, a controlled substance under Schedule I of the Dutch Opium Act.  None of the Suspect's advertisements specified the chemical composition of the weight loss pills, but lab analysis of weight loss pills that were intercepted during postal transit showed that they contained amphetamine.

9.     In the summer of 2022, Dutch authorities began a criminal investigation into **Facebook account ID 100080329325309** with username **Peterjan Rens ("Target Account One")**.  Dutch authorities observed a publicly available post that is dated May 17, 2022, on **Target Account One**, which advertised the sale of weight loss pills.  **Target Account One**'s post from May 17, 2022, also had a review from another Facebook user, who claimed to have lost 12 kilograms (approximately 26.5 pounds) and thanked the Suspect for the weight loss pills. Dutch authorities observed that **Target Account One** contained other public posts related to the sale of the weight loss pills.

---

[1]  The Attorney General, through regulations and Department of Justice directives, has delegated to the Office of International Affairs the authority to serve as the "Central Authority" under treaties and executive agreements between the United States and other countries pertaining to mutual assistance in criminal matters.  *See* 28 C.F.R. §§ 0.64-1, 0.64-4, and Appendix to Subpart K, Directive Nos. 81B and 81C (2018).

10.     Between June 29, 2022, and July 9, 2022, inspectors from the Netherlands Food and Consumer Product Safety Authority ("NVWA") contacted the Suspect at **Target Account One** via Facebook Messenger.  The NVWA inspectors asked the Suspect about purchasing the weight loss pills and about what substances were in the pills.  However, the Suspect responded that he could not say anything about the composition of the weight loss pills.

11.     The initial investigation into **Target Account One** ended on August 4, 2022, after Dutch authorities contacted the Suspect and searched his home.  However, on September 5, 2022, Dutch authorities reopened their investigation after learning the Suspect was continuing to sell the weight loss pills over Facebook.

12.     On September 5, 2022, Dutch authorities also discovered that the Suspect was using **Facebook account ID 100056904720046** with username **Peter Janrens** ("**Target Account Two**") to market and sell weight loss pills.  The first public post on **Target Account Two** observed by Dutch authorities occurred on September 17, 2021.  This post advertised the sale of weight loss pills and stated that the contents of the weight loss pills had recently been changed.

13.     On October 10, 2022, Dutch authorities intercepted an envelope containing the weight loss pills sent by the Suspect via the postal service.  A lab analysis of the weight loss pills showed that the pills contained amphetamine.  Dutch authorities interviewed the intended recipient of the weight loss pills on October 13, 2022.  The intended recipient stated she bought the weight loss pills from the Suspect after messaging with him at **Target Account Two** via Facebook Messenger.

14.     On October 10, 2022, Dutch investigators found **Facebook account ID 100084368808895** with username **Jan Rens De Enige Echte** ("**Target Account Three**").  The

publicly available posts on **Target Account Three** relate to the sale of weight loss pills, and the posts began on August 15, 2022.

15.    Dutch authorities arrested the Suspect and searched his house for a second time on October 13, 2022.  On October 13, 2022; October 14, 2022; October 20, 2022; and October 18, 2022, Dutch authorities interviewed the Suspect about the sale of weight loss pills via **Target Account One**, **Target Account Two**, and **Target Account Three**.  The Suspect admitted to Dutch authorities that he sold the weight loss pills over Facebook from May 2021 to October 13, 2022.  Dutch authorities obtained bank records from the Suspect that supported the Suspect's statement that he had begun selling the weight loss pills as early as May 2021.  Furthermore, Dutch authorities observed that the public posts about the weight loss pills on **Target Account One**, **Target Account Two**, and **Target Account Three** ceased after October 13, 2022.

16.    Dutch authorities obtained non-content records pertaining to **Target Account One**, **Target Account Two**, and **Target Account Three** from PROVIDER.  The non-content records stated that all three Facebook accounts were created via an Internet Protocol address that is registered at the Suspect's home address.

17.    Moreover, the non-content records from PROVIDER showed that **Target Account One** was registered on April 7, 2022.  As stated above, Dutch authorities observed a publicly available post advertising the sale of weight loss pills made on May 17, 2022.  Additionally, the posts regarding the weight loss pills on **Target Account One** did not finally cease until the Suspect was arrested on October 13, 2022.

18.    As stated above, Dutch authorities observed that the Suspect posted about the sale of the weight loss pills on **Target Account Two** as early as September 17, 2021.  The Suspect admitted to selling the weight loss pills via Facebook as early as May 2021.

19.     Finally, PROVIDER's non-content records showed that **Target Account Three** was verified on August 14, 2022, shortly after Dutch authorities first contacted the Suspect and searched his home in response to the weight loss pill activity they had witnessed on **Target Account One**.  As stated above, the Suspect began to post advertisements for the sale of the weight loss pills the day after **Target Account Three** was verified, on August 15, 2022.

20.     PROVIDER services **Target Account One**, **Target Account Two**, and **Target Account Three**.  Accordingly, authorities in the Netherlands seek records from PROVIDER to secure relevant evidence and determine the scope of the Suspect's criminal activity.

## BACKGROUND CONCERNING PROVIDER

33.     PROVIDER owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.  Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

34.     PROVIDER asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

35.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request"

accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

36.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

37.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

38.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video and can be tagged

by others.  When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

39.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video.  PROVIDER retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

40.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

41.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

42.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

43.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

44.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

45.     In addition to the applications described above, PROVIDER provides users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

46.     PROVIDER also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by PROVIDER along with a timestamp.

47.     PROVIDER retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

48.     Social networking providers like PROVIDER typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with PROVIDER about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like PROVIDER typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

49.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling prosecutors to establish and prove each element or

alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by PROVIDER, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, PROVIDER logs the IP addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, location information retained by PROVIDER may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime), or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement).

50.     In summary, based on my training and experience in this context, I believe the servers of PROVIDER are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved messages for Provider subscribers), as well

11

as PROVIDER-generated information about its subscribers and their use of PROVIDER services

and other online services.  In my training and experience, all of that information may constitute

evidence of the crimes under investigation because the information can be used to identify the

account's user or users.  In fact, even if subscribers provide PROVIDER with false information

about their identities, that false information often nevertheless proves clue to their identities,

locations, or illicit activities.[2]

## <u>REQUEST TO SUBMIT WARRANT BY TELEPHONE</u><br><u>OR OTHER RELIABLE ELECTRONIC MEANS</u>

51.      I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of

Criminal Procedure, permission to communicate information to the Court by telephone in

connection with this Application for a Search Warrant.  I submit that OIA Trial Attorney

Anthony Kuhn, an attorney for the United States, is capable of identifying my voice and

telephone number for the Court.

---

[2] At times, social media providers such as PROVIDER can and do change the details and functionality of
the services they offer.  While the information in this section is true and accurate to the best of my
knowledge and belief, I have not specifically reviewed every detail of PROVIDER's services in
connection with submitting this application for a search warrant.  Instead, I rely upon my training and
experience, and the training and experience of others, to set forth the foregoing description for the court.

Case 1:23-ml-01937-RBC   Document 1   Filed 10/12/23   Page 25 of 26


## CONCLUSION

52.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

/s/ Todd C. Bina
_____

**Todd C. Bina**
Supervisory Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on this **13th** day of **October**, 2023.

_____
Robert B. Collings
UNITED STATES MAGISTRATE JUDGE

13

## Relevant Provisions of Dutch Law

**Article 2 of the Dutch Opium Act**

It is prohibited:

    (a) to bring into or take out of the territory of the Netherlands;

    (b) to prepare, to treat, to process, to sell, to deliver, to supply, or to transport;

    (c) to have at one's disposal; or

    (d) to manufacture

any substance listed under Schedule I of this Act, or any substance as designated under the provisions of Article 3a, paragraph 5.[1]

**Article 10 of the Dutch Opium Act**

1. He who acts contrary to … (a) a prohibition laid down in Article 2 … shall be punished by imprisonment for not more than six months or a fine of the fourth category.

…

3. Any person who intentionally contravenes the prohibition laid down in Article 2(c) shall be punished with imprisonment for not more than six years or a fine of the fifth category.

…

4. Any person who intentionally contravenes the prohibition laid down in Article 2(b) or (d) shall be punished with imprisonment for not more than eight years, or a fine of the fifth category.

**Article 40 of the Dutch Medicines Act**

(1) Placing a medicinal product on the market without marketing authorization from the European Union, granted pursuant to Regulation (EC) no. 726/2004, or pursuant to said Regulation in conjunction with Regulation 1394/2007, or from the Board, granted pursuant to this Chapter.

(2) It is prohibited to have a medicinal product, for which a marketing authorization is not in force, in stock, to offer for sale, to sell, to supply, to hand over, to import, to export, or bring in or out of the territory of the Netherlands.

**Article 174 of the Dutch Penal Code**

1. A person who sells, offers for sale, delivers, or distributes goods, knowing that these are injurious to life or health, and conceals that injurious nature, is punishable by a term of imprisonment of not more than fifteen years or a fine of the fifth category.

2. Where the death of a person ensues from the act, the offender is subject to a term of life imprisonment or temporary imprisonment of not more than thirty years or a fine of the fifth category.

---

[1] Amphetamine is listed in Schedule I of the Dutch Opium Act.